## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DENNIS PLUTO,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Civil Action No. 06-425** |
| | )     **Electronically Filed** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**September 14, 2006**

### I.      Introduction

Plaintiff Dennis Pluto brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("Act"), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") finding that his disability ended on March 9, 2001 and concluding that he was no longer entitled to Disability Insurance Benefits ("DIB") under title XVI of the Act. Consistent with the customary practice in the Western District of Pennsylvania, the parties have submitted cross motions for summary judgment and the record developed at the administrative proceedings.

After careful consideration of the Administrative Law Judge's ("ALJ's") Decision, the memoranda of the parties, and the entire record, the Court finds the ALJ's decision is supported by substantial evidence, and therefore will deny plaintiff's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the determination by the Commissioner.

## II.      Procedural History

Plaintiff applied for DIB on September 13, 2000, alleging disability since September 24,

1999, because of four surgeries on his right knee, blindness in his left eye, stress, and anxiety.  R.73-

75, 84.  The application was denied initially.  R.45-49.  On July 11, 2001, the first of three hearings

was held before ALJ Robert C. Deitch, at which plaintiff testified, as did a vocational expert.

Plaintiff was represented by counsel.[1]  R.150.

On September 27, 2001, the ALJ determined that plaintiff was entitled to a closed period of

DIB from September 24, 1999 through March 9, 2001.  R.150-58.  For the period thereafter,

however, the ALJ found plaintiff's medical improvement sufficient to permit him to perform

sedentary work, explaining:

> As of March 9, 2001, and continuing, the [ALJ] finds that [plaintiff] retains the
> residual functional capacity to perform sedentary work not involving kneeling,
> crouching, crawling, various pushing or pedal motions with the right lower extremity,
> more than occasional climbing, balancing, and stooping, and more than occasional
> reading or writing.

R.154.  The ALJ concluded that, although plaintiff's limitations left him unable to return to his prior

work as a general laborer and custodian, he was capable of performing the full range of sedentary

jobs available to him in the national economy, and that he therefore was not disabled, based on the

testimony of the vocational expert ("VE") and reference to the Medical-Vocational Guidelines. R.

155-58.

The Appeals Council affirmed the ALJ's finding that plaintiff was disabled beginning on

September 24, 1999.  R.21.  Because of a lost hearing cassette, however, the Appeals Council

---

[1] Because the first two decisions were vacated by the Appeals Council, the only operative
decision is that rendered after the third hearing.  Accordingly, only the ALJ's findings after the
ultimate hearing will be summarized.

granted plaintiff's request for review with respect to the issue of his disability on and after March 9, 2001.  R.21.  Accordingly, the ALJ held a second hearing on July 10, 2003.  On June 18, 2004, the ALJ issued a decision finding that plaintiff was entitled to benefits through June 1, 2001, but not thereafter.  R.573-86.   The Appeals Council granted plaintiff's request for review, vacated that second hearing decision, and remanded the case to a new ALJ[2] for further proceedings, instructing that ALJ to conduct a new hearing and evaluate the issue of plaintiff's disability for the period beginning March 9, 2001.  R.591-93.

Pursuant to the Appeals Council's remand order, ALJ John J. Mulrooney, II conducted the third hearing on February 3, 2005.  R.814-58.  Plaintiff once again appeared with counsel and testified, as did his clinical therapist and a vocational expert.  On June 25, 2005, the ALJ issued a decision finding that plaintiff's disability ended due to medical improvement on March 9, 2001. R.21-32.  The ALJ made the following specific findings:

1.  The claimant met the disability insured status requirements of the Act on September 24, 1999, his alleged onset date, and continues to meet them through June 30, 2006.

2.  The claimant has not engaged in substantial gainful activity since alleging disability on September 24, 1999.

3.  The medical evidence establishes that the claimant currently has severe impairments consisting of osteoarthritis of the right knee, right sacroillitis, left eye strabismus

---

[2] The HALLEX regulations define the Social Security Administration's internal procedures.  Those regulations provide, in relevant part:

Appeals Council remands [will be assigned] to the same ALJ who issued the decision or dismissal unless: a. the case was previously assigned to that ALJ on a prior remand from the Appeals Council and the ALJ's decision or dismissal after remand is the subject of the new Appeal Council remand, or b. the Appeals Council or the court directs that the case be assigned to a different ALJ.

*See* HALLEX § I-2-155 D.11.

amblyopia, macular degeneration of the right eye, a major depressive disorder, a generalized anxiety disorder, an attention deficit hyperactivity disorder and a history of substance abuse, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The medical evidence also shows that the claimant has a history of hypertension, hyperlipidemia, gastritis, diverticulitis and gastroesophageal reflux disease and that he is status post an avulsion fracture of the left ankle; however, these additional impairments do not have more than a minimal impact on the claimant's ability to perform work-related activities and are therefore "nonsevere."

4.    Since March 9, 2001, the claimant's allegations of totally disabling exertional and nonexertional limitations and pain, when considered in accordance with Social Security Regulation 404.1529 and Social Security Ruling 96-7p, are not fully credible and not consistent with the clinical and objective findings, the claimant's self-reported activities of daily living, his overall testimony and the other evidence of record.

5.    Since March 9, 2001, the claimant has had the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for work requiring lifting and carrying objects weighing more than 10 pounds, prolonged standing or walking, more than occasional stooping or climbing of ramps or stairs, any balancing, kneeling, crouching, crawling, or climbing of ladders, ropes, or scaffolds, pushing/pulling with the right lower extremity, including the operation of pedals, bilateral peripheral visual acuity or fine near visual acuity, more than occasional interaction with supervisors, co-workers or the general public, the stress associated with a fast paced production environment, more than simple, work-related decisions, frequent work place changes, the performance of other than simple, repetitive, routine job tasks or prolonged reading for content/comprehension (20 C.F.R. 404.1545).

6.    The claimant is unable to perform his past relevant work as a loader/unloader and custodian.

7.    Since March 9, 2001, the claimant's residual functional capacity for the full range of sedentary work has been reduced by the limitations set forth in Finding No. 5.

8.    The claimant was 44 years old on March 9, 2001, and is currently 48 years old, which is defined as a younger individual (20 C.F.R. 404.1563).

9.    The claimant has a general equivalency diploma (20 C.F.R. 404.1564).

10.    In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material (20 C.F.R. 404.1568).

4

11.   Since March 9, 2001, based on an exertional capacity for sedentary work and the claimant's age, education, and work experience, Section 404.1569 and Rules 201.28 (prior to attainment of age 45) and 202.21 (attainment of age 45), Table No. 1, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion that the claimant is not disabled.

12.   Although the claimant's additional nonexertional limitations have not allowed him to perform the full range of sedentary work since March 9, 2001, using the above-cited rules as a framework for decisionmaking, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include a grinding machine operator, a hand assembler of meters and an ampoule sealer.  These jobs exist in significant numbers throughout the region of the claimant's residence as well as in the national economy.

13.   The claimant has not been under a "disability," as defined in the Social Security Act, at any time since March 9, 2001 (20 C.F.R. 404.1520(f)).

R.30-32.  In sum, the ALJ found that "there has been medical improvement in [plaintiff's] condition since March 9, 2001," such that he could perform sedentary work.  R.27.

The Appeals Council denied plaintiff's request to review the third decision, making it the final decision of the Commissioner.  R.12-14.  Thereafter, plaintiff timely commenced this action, which now is before this Court on the cross motions for summary judgment, under Rule 56 of the Federal Rules of Civil Procedure.

## III.    Statement of the Case

As of March 9, 2001 — the date that the ALJ determined that his disability ended — plaintiff was 44 years-old.  R.22.  He has a GED and has past relevant work experience as a loader-unloader and custodian.  R.22.

The medical record shows that plaintiff underwent four surgeries for osteoarthritis of the right knee between July 1998 and May 2000.  R.233, 239-40, 262-67, 271-74.  As of March 9, 2001, plaintiff had reported to Dr. Thomas Whitten, M.D. — his pain-management specialist — that the

Motrin and OxyContin he had been taking for pain control were working well.  R.407.  By that date, plaintiff's knee was stable, and the only treatment change that his doctor made was to prescribe a TENS unit.  R.407.  On May 31, 2001, however, Dr. Craig H. Bennett, M.D., reported that he was considering whether plaintiff should undergo a  unicondular knee replacement operation because of his recurrent complaints of right knee pain.  R.573-74.  Plaintiff did not see Dr. Bennett again for nearly a year.  R.572.

In the meantime, plaintiff saw Dr. Whitten.  On June 1, 2001, plaintiff told Dr. Whitten that his TENS unit was helping his pain, that chiropractic treatment was helpful, and that his pain was adequately controlled with OxyContin.  R.472.  On September 21, 2001, Dr. Whitten opined that plaintiff could not return to his previous work as a school custodian.  R.468.  Dr. Whitten added, however, that it was "certainly possible for him to return at a lower level of activity with a lighter duty," and added that plaintiff could return to gainful employment with a knee replacement surgery and proper rehabilitation.  R.468.

Plaintiff finally saw Dr. Bennett again on May 30, 2002.  R.572.  At that time, Dr. Bennett found roughly normal ranges of motion, some atrophy of the calf, and opined that plaintiff would be a candidate for a unicompartmental knee replacement as well as a medial compartment spacer.  R.572.  In the meantime, he fitted plaintiff with a medial brace.  R.572.  By October 2002, plaintiff reported no pain relief with his knee brace.  R.571.  Although Dr. Bennett noted that the x-ray films did not show any joint space narrowing, he opined that — based on plaintiff's continued reports of knee pain — a unicondylar knee replacement surgery was a last resort.  R.571.  By December 20, 2002, plaintiff had been taken off OxyContin and placed on Methadone; on that date, he reported to Dr. Whitten that he was having "excellent" pain relief with the Methadone with no adverse side

6

effects.  R.448.

On November 10, 2003, plaintiff saw Robin West, M.D. for knee pain.  R.683.  Dr. West found a slight limitation in plaintiff's range of motion in his right knee, 10% calf atrophy in his right calf, and slight right knee effusion.  R.683.  As plaintiff had no instability in that knee, no significant joint line tenderness, and no joint space narrowing, Dr. West diagnosed right medial compartment chondrosis and administered a cortisone injection to plaintiff's right knee. R.683.  On March 4, 2004, Dr. West saw plaintiff again; on that occasion, he opined that plaintiff was *not* a good candidate for a total knee replacement, citing his young age and the minimal radiographic changes to his knee. R.682.

On September 14, 2004, Dr. A. Robert Wigle, M.D., examined plaintiff.  R. 700.  On that occasion, Dr. Wigle reported no gross instability in his right knee, a well-preserved joint space, and minimal osteophyte formation.  R.700.  Like Dr. West, Dr. Wigle agreed that a total knee replacement was unwarranted; instead, he opined that all conservative options should be exhausted before a knee replacement operation would be in order.  R.700.  The following month, plaintiff saw Dr. Edward T. Bradjic, O.D., for complaints related to his eyesight.  R.701.  After examining plaintiff's eyes, Dr. Bradjic concluded that he had suffered from congenital left eye strabismus amblyopia and that he had non-exudate macular degeneration in his right eye.  R.701.  Plaintiff's best corrected vision was 20/20 his right eye, and 20/200 in his left eye.  R.701.

Plaintiff also sought treatment for various mental impairments.  Specifically, Dr. Thomas Tomci, M.D., plaintiff's family physician, prescribed Xanax to treat plaintiff's anxiety.  R.568.  Later, Dr. Tomci switched this prescription to Celexa because of the addictive potential of Xanax.  R.567.  In June 2004, plaintiff began seeing Ms. Dorothy Murphy, M.Ed., a counselor.  R.696.  Ms.

Murphy counseled plaintiff for symptoms of anxiety, major depression, and a mood disorder, pegged his GAF at 60, and recommended that he receive a full psychiatric evaluation from a doctor.  R.696. The following month, per Ms. Murphy's recommendation, plaintiff underwent a psychiatric evaluation with Dr. Ben Brinkley, M.D.  R.686-90.  A mental status examination showed no overt evidence of depression and that plaintiff was well-oriented with intact immediate, recent, and remote memory, although plaintiff did display adult ADHD and a mixed depression/anxiety syndrome resulting from his current physical problems and the loss of his relationship with his son.  R.689. Dr. Brinkley estimated plaintiff's IQ was average but considered his judgment and insight "questionable."  R.689.  Ultimately, Dr. Brinkley assessed plaintiff's current GAF at 40 and prescribed Xanax and Zoloft.  R.689.

At the Commissioner's request, Dr. S.P. Barua, M.D., examined plaintiff's orthopedic condition on November 17, 2004.  R.710-16.  Plaintiff told Dr. Barua that he used a knee brace, with some pain relief to his knee, and stated that he used a cane occasionally.  R.711.  Plaintiff also stated that he lived alone and was able to do light work around his house.  R.711.  During that examination, plaintiff indicated that his knee hurt when he put weight on it, and rated his pain at an 8 out of 10 in that situation, or a 2-3 out of 10 when he did not put his weight on it.  R.710.  Plaintiff claimed that, because of swelling and instability in his right knee — which symptoms were exacerbated by cold or damp weather — he could only walk two blocks.  R.710.  He stated that he had difficulty climbing ladders but admitted that he could squat and kneel, albeit with discomfort.  R.711.  During the examination, plaintiff displayed difficulty squatting and kneeling, but was able to climb steps and get on and off the examining table with no difficulty; he also could stand and walk on his toes and heels, albeit with some difficulty.  R.711.  Although plaintiff's showed normal circulation and no

instability in his knees, he had slightly diminished right leg strength and range of motion in his right leg. R.711-12.  Ultimately, Dr. Barua diagnosed degenerative arthritis involving the medial compartment of his right knee; he opined that plaintiff did not need a cane for walking. R.712.  This examining physician concluded that plaintiff could occasionally lift or carry up to 30 pounds and that he could frequently lift or carry up to 15 pounds.  R.714.  He believed that plaintiff could stand or walk for a total of four hours in an eight-hour workday, and opined that plaintiff could sit without limitation.  R.714.  Additionally, Dr. Barua opined that plaintiff could climb, stoop, kneel, balance, crouch, and crawl occasionally.  R.714.  This doctor further concluded that heights, humidity, and temperature extremes would exacerbate the arthritis in plaintiff's right knee — the injury from which all of plaintiff's restrictions stemmed.  R.713-16.

Also at the request of the Commissioner, Dr. Tim Bridges, M.D., performed a psychological evaluation on November 10, 2004.  R.703-09.  Plaintiff drove himself to that appointment and was punctual.  R.705.  In Dr. Bridges' opinion, plaintiff's mood was euthymic, his affect was appropriate, with no hallucinations or delusions, his thought processes were goal-directed and organized, and his intelligence was within the average range.  R.705.  Dr. Bridges diagnosed anxiety and depression because of plaintiff's ambulation difficulties following his four knee surgeries, as well as a generalized anxiety disorder.  R.706.  He opined that plaintiff had a GAF of 65, and stated that plaintiff's impairment did not affect his ability to understand, remember, and carry out instructions, or his ability to appropriately respond to supervisors, co-workers, and work pressures in a work setting.  R.707-08.

At the third hearing, plaintiff confirmed that he had undergone four surgeries on his right knee, all well before March 2001.  R.833-34, 835-36.  Although plaintiff's treating physician had

recommended a partial knee-replacement surgery, plaintiff stated that he had not undergone the surgery because his Worker's Compensation insurance would not pay for it.  R.834-35.  Plaintiff explained that Dr. Bennett, had left the state, added that he was having difficulty locating doctors who would take his insurance, and said that he had last seen a doctor for his knee "a few months" before the March 2005 hearing.  R.836-40.  Plaintiff told the ALJ that he wore a knee brace whenever he left the house because, if he did not do so, his knee would give out on him within a half hour or so.  R.849-50.  He added that, even with the knee brace, he could only stand for a half hour at a time because his leg would swell and reduce the effectiveness of the brace.  R.850.

Plaintiff also explained the effect of his other impediments.  Specifically, plaintiff admitted that he had never been hospitalized for psychiatric problems, but added that being legally blind in one of his eyes had prevented him from becoming a driver at UPS or a firefighter.  R.847-49.  He also explained that he suffered from a constant upset stomach, which he attributed to either a hiatal hernia or to "worrying all the time."  R.852.  As to his pharmacological regimen, plaintiff told the ALJ that he was undergoing Methadone treatments five days per week to wean him from the OxyContin that he previously had been prescribed for his pain.  R.834-37.  In addition, plaintiff took Vicodin, Xanax, Nexium, Advil, and Tylenol.  R.120, 143.  Plaintiff denied experiencing any deleterious side-effects from his medications.  R.847.

Regarding his daily activities, plaintiff testified that he lived alone and cared for his house, preparing food and washing dishes without assistance.  R.840, 842.  Plaintiff admitted that he was able to pay his own bills and take out the trash.  R.848.  He added that, although he was capable of doing his own laundry, a friend helped him with this chore.  R.842-43.  Plaintiff was able to go to the grocery store, but stated that a cousin usually did his basic shopping for him.  R.843.  He admitted, however, that he "occasionally" would go to restaurants or go down to the fire department

to chat with friends who worked there.  R.845, 847.  Although plaintiff stated that doctors told him

he could walk with a cane as needed, he stated that he avoided walking because the cane he had been

using had broken in half when his knee gave out on him a year earlier.  R.843.  To stay comfortable,

plaintiff tried to sit so that he could keep his right knee extended; to pass the time, he watched

television or read magazines.  R.835, 844.

The ALJ also heard the testimony of Ms. Dorothy Murphy, plaintiff's clinical therapist.

R.822-31.  Ms. Murphy testified that she had been counseling plaintiff from two to four times per

month during the seven months preceding the hearing.  R.823.  She stated that she worked with

plaintiff's psychologist — who had diagnosed him with major depression, anxiety, and attention

deficit disorder — and that she had been helping to educate plaintiff about how to cope with his

physical pain and his depression about the limitations that his impairments place on his lifestyle.

R.823-26.  Ms. Murphy confirmed that plaintiff displayed difficulty remaining focused and

completing tasks, symptoms that she believed were consistent with the diagnoses of depression and

adult ADD.  R.827-28.  She conceded that, under her care, plaintiff had shown some improvement.

R.829-31.

Finally, the ALJ took the testimony of Mark L. Heckman, a vocational expert.  R.853.  Mr.

Heckman classified plaintiff's prior employment as a loader-unloader and custodian as semi-skilled

and either medium or heavy, but stated that these skills would not transfer over to sedentary work.

R.853-54.  The ALJ then posed the following hypothetical question to the vocational expert:

> Assume [...] a hypothetical individual of [plaintiff's] past education, training, [and]
> work experience, and assume in my hypothetical that the person is limited to a
> sedentary range of work as that term is defined under the regulations.  Assume that
> the person is limited to occasional stooping and climbing on ramps and stairs.
> Assume that the person must avoid all balancing, and when I say balancing, I mean

balancing from an ambulating position, not a sitting position. Assume that the person must avoid all kneeling, crouching, crawling, and climbing on ladders, ropes and scaffolds. Assume the person must avoid all pushing and pulling with the lower right extremity to include the operation of pedals, and assume, please, that the person is limited to occupations which do not require bilateral or peripheral visual acuity. Assume the person does not need fine near visual acuity. Assume the person is limited to simple, routine repetitive tasks not performed in a fast paced production environment involving only simple work-related decisions, and in general, relatively few work place changes. Assume the person is limited to occasional interaction with the supervisors, coworkers, and members of the general public, and by interaction, I don't just mean being at the same place at the same time with people, I mean having to substantively interact with them. Assume the person is limited to occupations which require no prolonged reading or content and comprehension. That would not prohibit the person from reading simple instructions or reading up to brief periods of time, up to a half hour, but the person obviously couldn't be an editor or a proof reader, something of that nature.

R. 854-55. In response to this question, the vocational expert opined that a person with these limitations could perform several jobs existing in significant numbers in the local and national economies, including that of grinding-machine operator, hand assembler of rotors, and ampoule sealer. R.855-56. The expert conceded, however, that if this hypothetical person needed more than the typical number of breaks and absences from work, he would be "eliminated from those jobs very shortly after the behavior began." R.856.

On the basis of the foregoing medical evidence and testimony, the ALJ determined that plaintiff suffers from osteoarthritis of the right knee, right sacroillitis, left eye strabismus amblyopia, macular degeneration of the right eye, a major depressive disorder, a generalized anxiety disorder, attention deficit hyperactivity disorder, and a history of substance abuse. R.22. The ALJ concluded that all of these impairments were "severe," but not severe enough to meet or equal a Listing. R.22-23. The ALJ also rejected plaintiff's subjective symptom complaints as less than fully credible, explaining that his daily activities as well as the diagnostic and treatment record were "inconsistent

with an individual experiencing totally debilitating symptomatology." R.27.

Ultimately, the ALJ found that plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work, consistent with his hypothetical question to the vocational expert. The ALJ specifically explained:

> [S]ince March 9, 2001, [plaintiff's] impairments, in combination with his subjective allegations, have precluded work requiring lifting and carrying objects weighing more than 10 pounds, prolonged standing or walking, more than occasional stooping or climbing of ramps or stairs, any balancing, kneeling, crouching, crawling or climbing of ladders, ropes or scaffolds, pushing/pulling with the right lower extremity, including the operation of pedals, bilateral peripheral visual acuity or fine near visual acuity, more than occasional interaction with supervisors, co-workers or the general public, the stress associated with a fast paced production environment, more than simple, work-related decisions, frequent work place changes, the performance of other than simple, repetitive, routine (i.e., unskilled) job tasks or prolonged reading for content/comprehension, but have not precluded [him] from performing a wide range of work at the sedentary exertional level.

R.27-28. Accordingly, the ALJ determined that plaintiff could perform the sedentary jobs that the vocational expert had identified, and that he had not been disabled after March 9, 2001. R.31-32.

In his brief in support of his motion for summary judgment, plaintiff raises three issues. First, plaintiff insists that the ALJ erred in concluding that he had shown medical improvement within the meaning of the regulations. (Pl. Brief at 7-12). Next, plaintiff argues that the ALJ's adverse credibility determination was not supported by substantial evidence. (Pl. Brief at 12-13). Third, and finally, plaintiff contends that the ALJ erred in determining that he had not required aggressive treatment for pain in his right knee and lower back. (Pl. Brief at 13-14). The Commissioner argues that all of the ALJ's findings were supported by substantial medical and other evidence of record. (*See generally* Comm. Brief at 11-14).

The Court will examine each of these issues, albeit in a more logical order than the order in

which the parties have briefed them.  As will be explained below, the Court concludes that the ALJ's

ultimate decision is supported by substantial evidence.  For that reason, the Commissioner's motion

for summary judgment must be granted, and plaintiff's motion must be denied.

### IV.     Standards of Review

Congress has provided for judicial review of the Commissioner's final dispositions of

disability claims through 42 U.S.C. §§ 405(g)[3] and 1383(c)(3).[4]  Section 405(g) permits a district

court to review transcripts and records upon which a determination of the Commissioner is based.

Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and

judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-

1383f, regarding Supplemental Security Income, or "SSI"), disability decisions rendered under Title

II are pertinent and applicable to those rendered under Title XVI.  *See Sullivan v. Zebley*, 493 U.S.

521, 525 n. 3 (1990).

To demonstrate disability under Title II or Title XVI of the Act, a claimant must demonstrate

an inability to "engage in any substantial gainful activity by reason of any medically determinable

---

[3] Section 405(g) provides in pertinent part:
>    Any individual, after any final decision of the [Commissioner] made after a
>    hearing to which he was a party, irrespective of the amount in controversy, may
>    obtain a review of such decision by a civil action . . . brought in the district court
>    of the United States for the judicial district in which the plaintiff resides, or has
>    his principal place of business. . .

*See* 42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:
>    The final determination of the Commissioner of Social Security after a
>    hearing under paragraph (1) shall be subject to judicial review as provided in
>    section 405(g) of this title to the same extent as the Commissioner's final
>    determinations under section 405 of this title.

*See* 42 U.S.C. § 1383(c)(3).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1); 42 U.S.C. § 1383c(a)(3)(A).  Although the Court ordinarily uses a five-step methodology to determine disability, *see Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999), where — as here — the issue of medical improvement arises, 20 C.F.R. § 416.994(b)(5) provides a seven-step test under which termination-of-benefits inquiries are to be conducted.

The United States Court of Appeals for the Third Circuit has recognized that the seven-step test — rather than the usual five-step analysis — is proper when addressing questions of medical improvement.[5]  *See Reefer v. Barnhart*, 326 F.3d 376, 378 n.1 (3d Cir. 2003).  Under the applicable regulations, the seven-step process in as follows:

> *Step 1*. Do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of this chapter? If you do, your disability will be found to continue.

> *Step 2*. If you do not, has there been medical improvement as defined in paragraph (b)(1)(i) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step 3 in paragraph (b)(5)(iii) of this section. If there has been no decrease in medical severity, there has been no medical improvement. (See step 4 in paragraph (b)(5)(iv) of this section.)

> *Step 3*. If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1)(i) through (b)(1)(iv) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step 4 in paragraph (b)(5)(iv) of this section. If medical

---

[5] The Court is aware that HALLEX I-5-314A(V)(B)(1) instructs the decisionmaker "not [to] apply the medical improvement standard" when considering whether the individual would be disabled in light of his or her drug and alcohol addiction.  Although the ALJ acknowledged that plaintiff had a history of substance abuse, he concluded that this issue been resolved.  *See* R.26.  As plaintiff does not dispute that particular finding, the Court finds that it was appropriate for the ALJ to apply the seven-step "medical improvement" inquiry in this case.

15

improvement is related to your ability to do work, see step 5 in paragraph (b)(5)(v) of this section.

Step 4. If we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no medical improvement or if we found at step 3 in paragraph (b)(5)(iii) of this section that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (b)(3) and (b)(4) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step 5 in paragraph (b)(5)(v) of this section. If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

Step 5. If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function. If the residual functional capacity assessment in step 3 in paragraph (b)(5)(iii) of this section shows significant limitation of your ability to do basic work activities, see step 6 in paragraph (b)(5)(vi) of this section. When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

Step 6. If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

Step 7. If you are not able to do work you have done in the past, we will consider one final step. Given the residual functional capacity assessment and considering your age, education, and past work experience, can you do other work? If you can, disability will be found to have ended. If you cannot, disability will be found to continue.

See 20 C.F.R. § 416.994(b)(5)(i)-(vii)(emphasis added).  Accordingly, it is against this seven-step inquiry — and not the usual five-step analysis cited by plaintiff, see Pl. Brief at 7 — that the decision must be evaluated.

16

In proceeding through these seven steps, the ALJ must do more than simply state factual conclusions; instead, he must make specific findings of fact to support his or her ultimate findings. *Stewart*, 714 F.2d at 290. In making his or her determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain his or her reasons for rejecting such supporting evidence, especially when testimony of the claimant's treating physician is rejected. *See Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000). Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician: "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports" and other objective medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). If the ALJ or Commissioner believes the medical evidence is inconclusive or unclear as to whether claimant is unable to return to past employment or perform other substantial gainful activity, it is incumbent upon the ALJ to "secure whatever evidence [believed necessary] to make a sound determination." *Id.* at 36.

If supported by substantial evidence, the Commissioner's factual findings must be accepted as conclusive. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995); *Wallace v. Secretary of HHS*, 722 F.2d 1150, 1152 (3d Cir. 1983). The district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court has explained that "substantial evidence" means "more than a mere scintilla" of evidence, but rather, is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). *See Ventura*, 55 F.3d at 901 *quoting Richardson*; *Stunkard v. Secretary of the Dep't of Health and Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988). The United States Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002), *quoting Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993), *quoting Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *See Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). Consistent with those goals, substantial-evidence review requires the district court to consider only those findings upon which the ALJ based his or her decision. To do otherwise would run counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.' *Id.* at 87 (parallel and other citations omitted). This means that the court cannot rectify errors, correct omissions, or fill in the gaps in the ALJ's decision by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *See Fargnoli v. Massarini,* 247 F.3d 34, 44 n.7 (3d Cir. 2001) (reversing where "[t]he District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ.").

18

V.     **Discussion**

    A.     **Substantial Evidence Supports The ALJ's Adverse Credibility Determination**

Because the lion's share of plaintiff's claimed limitations spring from his allegations of disabling subjective symptoms, including pain and psychological limitations, the ALJ's decision turns on his conclusion that plaintiff's testimony was not altogether credible. R.26-27. Recognizing the importance of this issue, plaintiff challenges the ALJ's adverse credibility determination. (*See* Pl. Brief at 12-13). The Commissioner disagrees, arguing that this finding was supported by substantial evidence. (*See* Comm. Brief at 13). The Court agrees with the Commissioner.

Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65 (3d Cir. 1987), *relying on Green v. Schweiker,* 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). For this reason, an ALJ must give great weight to a claimant's subjective description of inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999), *relying on Dobrowolsky.*

Under the applicable regulations, the introduction of evidence of non-exertional limitations triggers the ALJ's duty to evaluate the credibility of a claimant's subjective symptom complaints, including allegations of disabling pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling ("SSR") 96-7(p).[6] As the Third Circuit has explained:

---

    [6] Social Security Rulings constitute the SSA's interpretations of the statute it administers and of its own regulations. *See Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851

> Allegations of pain and other subjective symptoms must be supported by objective
> medical evidence. Once an ALJ concludes that a medical impairment that could
> reasonably cause the alleged symptoms exists, he or she must evaluate the intensity
> and persistence of the pain or symptom, and the extent to which it affects the
> individual's ability to work. This obviously requires the ALJ to determine the extent
> to which a claimant is accurately stating the degree of pain or the extent to which he
> or she is disabled by it.

*Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999)(citations omitted). Accordingly, the ALJ may reject such claims if he does not find them credible. *See Schaudeck*, 181 F.3d 429 at 433.

As a practical matter, this means that the ALJ "must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). The Court ordinarily defers to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor. *See Reefer*, 326 F.3d at 380. If, however, an ALJ concludes the claimant's testimony is not credible, his decision must include the specific basis or bases for that conclusion. *See Cotter*, 642 F.2d at 705; *see also Schaudeck*, 181 F.3d at 433 (stating that "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work.")(*quoting* SSR 95-5p).

Subjective complaints of pain need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight. *Smith*, 637 F.2d at 972; *Bittel*, 441 F.2d at 1195.

(9th Cir.1996). Social Security Rulings do not have the force of law, *id.*; nevertheless, once published, they are binding on all components of the SSA. *Walton v. Halter*, 243 F.3d 703, 708 (3d Cir. 2001).

Although "there must be objective medical evidence of some condition that could reasonably produce pain, *there need not be objective evidence of the pain itself.*" *Green,* 749 F.2d at 1070-71 (emphasis added), *quoted in Mason,* 994 F.2d at 1067. Where a claimant's testimony as to pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount claimant's pain *without contrary medical evidence. Ferguson*, 765 F.2d at 37; *Chrupcala v. Heckler*, 829 F.2d 1269, 1275-76 (3d Cir. 1987); *Akers v. Callahan,* 997 F.Supp. 648, 658 (W.D. Pa. 1998). "Once a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere disbelief of the claimant's evidence. Instead, the Secretary must present *evidence to refute the claim. See Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981) (where claimant's testimony is reasonably supported by medical evidence, the finder of fact may not discount the testimony without contrary medical evidence)." *Williams v. Sullivan,* 970 F.3d 1178, 1184-85 (3d Cir. 1992) (emphasis added), *cert. denied* 507 U.S. 924 (1993).

In this case, the ALJ made a specific Finding that plaintiff's subjective symptom complaints were "not fully credible." R.31. In the body of his decision, the ALJ explained:

> [Plaintiff's] self reported activities of daily living are inconsistent with an individual experiencing totally debilitating symptomatology. [Plaintiff] reported he is able to care for his personal needs independently, watch television, drive short distances, read newspapers and magazines, and perform various household chores such as cooking, washing dishes, doing laundry, taking out the trash, grocery shopping and paying bills. The [ALJ] also notes that physical examinations have revealed evidence of only mild atrophy of the right quadriceps, which suggests that [plaintiff] is able to move about on a fairly regular basis notwithstanding his allegations of totally debilitating symptomatology.

R.26-27. This determination was reinforced by plaintiff's demeanor at the hearing, which showed that his "attention and concentration were not so adversely affected by his alleged pain/symptomatology that he was unable to follow the proceedings or respond appropriately to

questions."  R.27.  The ALJ concluded his adverse credibility determination by noting that "[t]he clinical and objective findings are also inconsistent with an individual experiencing totally debilitating symptomatology," and summarized the medical evidence on point.  R.27.

The Court finds that the ALJ's adverse credibility determination is supported by substantial evidence.  Plaintiff does not maintain that the ALJ misstated his level of activity or misrepresented the medical evidence that his knee is stable and has a nearly full range of motion.  It is well-established that a claimant's level of activity can undercut his claims of disabling pain.  *See Burns v. Barnhart*, 312 F.3d 113, 129-30 (3d Cir. 2002)(finding an ALJ's rejection of a claimant's complaints of debilitating pain was supported by substantial evidence, where those complaints were inconsistent with the claimant's activities).  Nor does plaintiff attempt to reconcile his activities — which included shopping, going to restaurants, driving, visiting his friends at the fire department, and doing light housework — with his insistence that he cannot perform even sedentary labor.  Instead, plaintiff does no more than emphasize that the medical evidence shows that his symptoms *could* have caused him debilitating pain.  (*See* Pl. Brief at 13).  This begs the question, for a simple reason: by reaching the issue of plaintiff's credibility at all, the ALJ implicitly accepted the proposition that his impairments had the potential to cause disabling pain and other symptoms.  *See Hartranft*, 181 F.3d at 362.  The only other evidence that plaintiff offers in support of his challenge to the ALJ's adverse credibility determination is his own testimony.  (*See* Pl. Brief at 13).  This, too, begs the question: a clamant cannot upset the ALJ's adverse credibility finding by pointing to the very testimony that the ALJ rejected.  Finally, plaintiff does not quarrel with the ALJ's finding that his demeanor at the hearing undercut his credibility.  (*See* Pl. Brief at 12-13).  The ALJ was entitled to consider how plaintiff's apparently comfortable, coherent demeanor at the hearing clashed with

22

his allegations of unbearable pain.  *See Reefer*, 326 F.3d at 380.

Although plaintiff briefs it as a stand-alone issue, his argument that the ALJ erred in finding that he did not require aggressive treatment (*see* Pl. Brief at 13-14) also bears directly on the ALJ's credibility determination, and properly is analyzed in this context.  *See Lozado v. Barnhart*, 331 F.Supp.2d 325, 338-39 (E.D. Pa. 2004)(analyzing an ALJ's discussion of a claimant's "conservative treatment" as a credibility issue).  The ALJ's finding on this issue was as follows:

> The medical evidence also shows that [plaintiff] has a history of right sacroillitis characterized by complaints of low back pain.  Although physical examinations by treating and consulting examiners have revealed evidence of paravertebral muscle spasm/tenderness with decreased lumbar range of motion, the [ALJ] notes that a physical examination in November 2002 revealed intact motor and sensory functioning with full range of motion of the extremities and negative straight leg raising bilaterally.  The [ALJ] also notes that there is no diagnostic evidence of disc herniation, spinal stenosis, nerve root impingement, arachnoiditis or other degenerative/arthritic abnormality of the lumbar spine notwithstanding [his] allegations of low back pain.  Finally, it is noted that [plaintiff] has not required aggressive medical treatment or surgical intervention for his condition.

R.24 (citation to record omitted).  As the foregoing reflects, the ALJ's characterization of plaintiff's treatment regimen was directed to his allegations of back pain only.[7]  Plaintiff has not cited any portion of the record which would substantiate his claim that he sought aggressive treatment for that impairment. (*See* Pl. Brief at 13-14).  The Court's review of the record confirms that plaintiff sought and received only conservative treatment — including chiropractic manipulation and stretching exercises — for his back pain, which his treating physician considered to be "secondary" to his right knee pain.  *See* R.416, 445-84, 487-535.

In sum, plaintiff has not demonstrated that the ALJ's adverse credibility determination lacks

---

[7] Accordingly, plaintiff's contention that the ALJ mischaracterized the type of *knee* treatment he required is based on his misreading of the decision.  (*See* Pl. Brief at 13-14).

the support of substantial evidence of record.  Providing credible evidence of the effects of his impairments was plaintiff's burden at the hearing, *see Gordon v. Califano*, 448 F.Supp. 125, 126 (E.D. Pa. 1978), and it is his burden here.  Because plaintiff has not met that burden, the ALJ's partial rejection of plaintiff's testimony about the debilitating effects of his pain must be upheld.

### B.    Substantial Evidence Supports The ALJ's Finding Of Medical Improvement Since March 9, 2001.

Plaintiff also contends that the ALJ erred in determining that he had experienced "medical improvement," arguing that the ALJ "ignored" and "misinterpreted" the medical record documenting the severity of his knee impairment.  (*See* Pl. Brief at 7-12).  The Commissioner insists that the ALJ correctly found medical improvement.  (*See* Comm. Brief at 11-14).  Once more, the Court agrees with the Commissioner.

Under the Act, disability benefits only will be terminated where there is substantial evidence demonstrating both medical improvement and the present ability to engage in substantial gainful activity.  *See* 42 U.S.C. § 423(f).  Medical improvement is determined through a comparison of a claimant's medical condition at the time of the termination hearing with that claimant's condition at the time of the last favorable medical decision that the claimant was disabled.  *See* 20 C.F.R. § 404.1594(b)(1).  If there is a medical improvement and an increase in the individual's functional capacity to do basic work activities, substantial evidence will support an ALJ's determination that medical improvement related to the ability to do work has occurred.  *See Allen v. Barnhart,* 417 F.3d 396, 399 (3d Cir. 2005).

In this case, as noted by the ALJ, treating and examining physicians concluded that plaintiff's right knee was stable, had a nearly full range of motion, and displayed little atrophy as of March

2001.  *See* R.407, 572, 683, 700, 711.  Additionally, the ALJ summarized the medical evidence as

showing that plaintiff's complaints of pain were treated with medication and medical devices,

without hospitalization or emergency-room care during the pertinent period.  R.27.  Substantial

evidence supports the ALJ's conclusion that plaintiff's pain was not so excruciating as to preclude

him from all gainful employment.  *See* R.407, 448, 472, 710.  Although the record does contain

evidence that plaintiff's pain never subsided entirely and that his other impairments produced

symptoms, the medical evidence on this point is, at best, a mixed bag of treatment notes

memorializing plaintiff's statements that he was receiving good relief from pain medications and yet

— often on the very same page — noting that he complained of chronic knee pain, often above a "7"

in intensity on the 10-point scale.  *See* R.407, 448, 453, 472.  It is ALJ's responsibility — and not

that of this Court — to resolve conflicts in evidence.  *See Plummer*, 186 F.3d at 429.  As explained

previously, these evidentiary conflicts bore directly on plaintiff's credibility.  Because substantial

evidence supports the ALJ's adverse credibility determination, the Court cannot say that the balance

the ALJ struck goes against the weight of the medical record.

The thrust of plaintiff's attack on the ALJ's finding of medical improvement is his contention

that the ALJ either ignored or misinterpreted the opinions of his treating physicians.  (*See* Pl. Brief

at 8-12).  It is true that, in considering claims for disability benefits, greater weight should almost

always be given to the findings of a "treating physician than to a physician who has examined the

claimant as a consultant."  *Adorno*, 40 F.3d at 47.  This means that the ALJ must explicitly "weigh

the relative worth of a treating physician's report against the reports submitted by other physicians."

*Id.* at 48 (citations omitted).  Accordingly, the ALJ must properly provide some explanation for the

rejection of "probative evidence [that] would suggest a contrary disposition."  *Id.* at 47 (citations

omitted).   A treating physician's opinion is only provided controlling weight when it is well supported by medically acceptable sources and not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Although plaintiff's brief is unclear on this point, his challenge to the finding of medical improvement may stem from his belief that the ALJ erred in rejecting the opinions of some of his treating physicians.  (*See* Pl. Brief at 8).  This argument, if plaintiff is making it, is unpersuasive in these circumstances.  The ALJ did explain that he would not give controlling weight to the opinion of Dr. Whitten, plaintiff's pain management specialist.  *See* R.28.  In no uncertain terms, the ALJ rejected Dr. Whitten's conclusory opinion that plaintiff would be unable to work until he underwent total knee-replacement surgery and rehabilitation, explaining that this opinion clashed with other evidence in the medical record.  *See* R.28; *see also* R.468.  A review of the record confirms that, contrary to Dr. Whitten's prognosis, other doctors who examined or treated plaintiff during the relevant period opined that he was *not* a good candidate for a knee replacement.  R. 443, 682, 700. Moreover, the RFC assessment provided by an examining physician indicated that plaintiff would be capable of performing *light* work, even in his current condition.  R.713-14.  In light of this conflict, and given that Dr. Whitten's conclusions were unsupported by any RFC assessment, the ALJ properly could and did reject his opinion on this ultimate issue.[8]  *See* R.28; *see also Jones v. Sullivan*, 954 F.2d 125, 128-29 (3d Cir.1991) (affirming an ALJ's finding that plaintiff's treating

---

[8] As the Third Circuit Court of Appeals has recognized, the deference afforded a treating physician's opinion does not mean that the statement of a claimant's treating physician supporting an assertion that she is "disabled" is dispositive of the issue.  *See Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir.1990).  Indeed, the ultimate disability determination is reserved for the ALJ and a treating physician's opinion on that topic is not entitled to any special significance. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); SSR 96-5p.

physician's opinion was not controlling where such opinion was conclusory and contradicted by substantial evidence in the record); *Mason*, 994 F.2d at 1065 (noting that a medical report by an examining physician may constitute substantial evidence of a claimant's physical condition).

The ALJ also declined to afford controlling weight to the February 2005 opinion of Dr. Brinkley — plaintiff's psychiatrist — that it would be "basically impossible" for plaintiff to return to his old job because of his physical and mental condition.  *See* R.29, 765.  The ALJ noted that Dr. Brinkley's dismal opinion was inconsistent with his own treatment notes from the prior nine months (which included Dr. Brinkley's initial observation that plaintiff presented with no overt evidence of depression, followed by his widely-fluctuating assessments of plaintiff's Global Assessment of Functioning ("GAF") score at 40,[9] 45,[10] or 60[11] over the next several months), and that his dismal prognosis was inconsistent with the specific findings of Dr. Bridges, an examining psychologist who

---

[9] A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("DSM- IV"), (4th ed. 1994), p. 30.   The GAF score is taken from the GAF scale which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.*  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death). *Id.*  As relevant to this case, the GAF rating scale set forth at Axis V of the DSM–IV in the 31-40 range indicates some impairment in reality testing or communication or a major impairment in several areas like work, school, family relations, judgment, thinking or mood.  *See* DSM-IV, at 32.

[10] A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* DSM-IV, at 34.

[11] A GAF score in the 51-60 range indicates either moderate symptoms or a moderate difficulty in social, occupational or school functioning. *See* DSM-IV, at 34.

opined that plaintiff suffered from only mild psychological limitations and had a GAF of 65.[12]  R.26, 29. 707.  Plaintiff does not dispute the ALJ's characterization of Dr. Bridges' opinion, or the ALJ's conclusion that Dr. Brinkley's assessment of plaintiff's mental impairment could not be reconciled with this evidence.  (*See* Pl. Brief).  It bears repetition that a treating physician's opinion on the nature and severity of a claimant's impairment has controlling weight only if it is both well-supported by medical evidence *and is not inconsistent with other substantial evidence in the record*, see 20 C.F.R. § 416.927(d)(2).  Because Dr. Brinkley's dismal prognosis could not be reconciled with his own treatment notes and was inconsistent with the opinion of the examining physician, the Court may not second-guess the ALJ's refusal to give Dr. Brinkley's opinion controlling weight.

In the end, the Court may not set the Commissioner's decision aside if it is supported by substantial evidence, even if we would have decided the factual inquiry differently.  *See* 42 U.S.C. § 405(g); *see also Hartranft*, 181 F.3d at 360.  Although it is clear that plaintiff suffers from an array of serious impairments and chronic joint pain, the Court cannot say that the ALJ's conclusion that he could perform sedentary work after March 9, 2001 was unsupported by the record.  That being so, plaintiff's contention that the substantial evidence does not bear out the ALJ's finding of medical improvement must be rejected.

### VI.    Conclusion

The Court has reviewed the ALJ's findings of fact and decision, and determines that his

---

[12] A GAF in the 61-70 range indicates "mild symptoms (e.g., depressed mood and mild insomnia)" or "some difficulty in social, occupational or school functioning. . . but generally functioning pretty well, has some meaningful personal relationships."  *See* DSM IV, at 32.

adverse credibility determination is supported by substantial evidence, as is his conclusion that the medical record showed medical improvement such that plaintiff was no longer disabled. Accordingly, the Court will deny Plaintiff's Motion for Summary Judgment, grant the Commissioner's, and affirm the decision of the ALJ/Commissioner.

An appropriate order will follow.


s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:     all counsel of ECF record

29